1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   CARINA DACER, et al.,

11          Plaintiffs,                          No. C 10-04165 WHA

12      v.

13   JOSEPH ESTRADA, et al.,                     **ORDER GRANTING IN PART
                                                 MOTION FOR DEFAULT
14          Defendants.                          JUDGMENT**

15   _____/

16                              **INTRODUCTION**

17          In this wrongful death action involving political torture and killings in the Philippines,

18   plaintiffs move for default judgment.  For the reasons stated below, the motion is **GRANTED IN**

19   **PART AND DENIED IN PART**.

20                               **STATEMENT**

21          Salvador Dacer was a prominent and influential publicist in the Philippines until he was

22   tortured and killed in November 2000 (Compl. ¶¶ 21, 54–58).  According to the complaint, his

23   death was orchestrated by high-ranking members of the Joseph Estrada administration who

24   perceived Salvador Dacer as a threat to their political power (Compl. ¶¶ 48–59).  At the time,

25   former defendant Panfilo Lacson and current defendant Michael Aquino held positions as

26   Director-General and Deputy Director, respectively, of the PNP-Intelligence Group, the

27   country's counterintelligence agency (Compl. ¶ 41).

28          On January 20, 2001, former defendant Estrada resigned the presidency in favor of then
     Vice-President Gloria Arroyo who was sworn in as the country's president the following day

**United States District Court**
For the Northern District of California

1    (Compl. ¶ 62).  President Arroyo directed her Department of Justice to investigate the abduction

2    and murder of Salvador Dacer (Compl. ¶ 68).  In May 2001, Lacson won a seat in the Philippine

3    Senate (*ibid.*).  Shortly after winning the seat, Lacson learned of the pending murder

4    investigation and told Aquino to escape to the United States (*ibid.*).  Aquino entered the United

5    States in July 2001 on a tourist visa (*ibid.*).  Arrest warrants in the Philippines were issued for

6    both Lacson and Aquino (Compl. ¶¶ 71, 85).

7         Lacson succeeded in getting the Philippine Court of Appeals to dismiss the arrest warrant

8    issued against him (Dkt. No. 10 at 3).  According to plaintiffs' first case management statement,

9    process servers in the Philippines are afraid to serve Lacson with the complaint and summons for

10   fear of being killed (Dkt. No. 28 at 3).

11        In September 2005, Aquino was arrested in the United States for illegal possession of

12   classified government documents.  *United States v. Aquino*, 2:05-cr-00719-WHW, Dkt. No. 16

13   (D.N.J. October 6, 2005).  He pleaded guilty and was sentenced to seventy-six months in prison.

14   *Aquino*, 2:05-cr-00719-WHW, Dkt. No. 65.  Subsequently, Aquino was extradited to the

15   Philippines where he was arrested on June 26, 2011, for the murder of Salvador Dacer (Dkt. No.

16   30 Exh. 1).  According to plaintiffs' pretrial conference statement, "the Philippine government

17   subsequently dismissed the case against Aquino on certain technicalities" (Dkt. No. 67 at 4).

18        Plaintiffs brought this action under the Alien Tort Claims Act ("ATCA"), 28 U.S.C.

19   1350, and the Torture Victim Protection Act ("TVPA"), note following 28 U.S.C. 1350, against

20   seven individuals they believed were responsible for the torture and death of their father,

21   Salvador Dacer, in the Philippines.  The complaint seeks $20 million in compensatory and $100

22   million in punitive damages (Compl. ¶¶ 91, 96, 99).

23        Defendant Michael Ray Aquino (proceeding *pro se*) filed a motion to dismiss, an answer

24   denying plaintiffs' allegations regarding his conduct, and a motion for summary judgment (Dkt.

25   Nos. 12, 30, 33).  Since his unsuccessful motion for summary judgment in 2011, Aquino has not

26   participated in this action.

27        Plaintiffs were unable to effect service upon the remaining defendants other than Glenn

28   Dumlao.  In July 2012, the unserved defendants were dismissed (Dkt. No. 60).  Plaintiffs'

2

United States District Court

For the Northern District of California

1    pretrial memorandum states that their claims against Dumlao "will be voluntarily dismissed"

2    (Dkt. No. 67 at 2).

3         In lieu of trial, plaintiffs were granted leave to file a motion for default judgment.  An

4    October 2013 order further stated (Dkt. No. 68):

5              plaintiffs' forthcoming default judgment motion should address the
     issue of jurisdiction under the Alien Tort Claims Act in light of

6              *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).
     Plaintiffs' motion should also address the issue of exhaustion of

7              remedies under Section 2(b) of the Torture Victim Protection Act.

8         Plaintiffs timely filed the instant motion requesting default judgement and a prove-up

9    hearing on damages (Dkt. No. 70).  A default judgment hearing was held on November 7.

10   Defendant Aquino did not appear.

11   **ANALYSIS**

12        "The district court's decision whether to enter a default judgment is a discretionary one."

13   *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (citations omitted).  Our court of appeals

14   outlined several factors that a court, in its discretion, may consider:

15             (1) the possibility of prejudice to the plaintiff, (2) the merits of
     plaintiff's substantive claim, (3) the sufficiency of the complaint,

16             (4) the sum of money at stake in the action, (5) the possibility of a
     dispute concerning material facts, (6) whether the default was due

17             to excusable neglect; and (7) the strong policy underlying the
     Federal Rules of Civil Procedure favoring decisions on the merits.

18
19   *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  Furthermore, "[t]he general rule of

20   law is that upon default the factual allegations of the complaint, except those relating to the

21   amount of damages, will be taken as true."  *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th

22   Cir. 1977) (citing *Pope v. United States*, 323 U.S. 1, 12 (1944)).  "[N]ecessary facts not

23   contained in the pleadings, and claims which are legally insufficient, are not established by

24   default."  *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

25        This order now turns to the merits and sufficiency of plaintiffs' claims.

26   **1.    MERITS AND SUFFICIENCY OF PLAINTIFFS' ATCA CLAIM.**

27        The Supreme Court recently explained that the ATCA generally has no extraterritorial

28   reach, and "even where the claims touch and concern the territory of the United States, they must

     do so with sufficient force to displace the presumption against extraterritorial application."

1    *Kiobel*, 133 S. Ct. at 1669.  Here, as in *Kiobel*, all of the relevant conduct took place outside of

2    the United States.  Under a straightforward reading of that decision, plaintiffs' ATCA claim is

3    barred.  Plaintiffs nevertheless argue that the presumption against extraterritoriality is displaced

4    by the fact that Aquino fled the Philippines for the United States in July of 2001 in order to avoid

5    prosecution in the Philippines.  This order disagrees.

6          The purpose of the presumption against extraterritoriality is to "protect against

7    unintended clashes between our laws and those of other nations which could result in

8    international discord. . . .  For us to run interference in a delicate field of international relations

9    there must be present the affirmative intention of the Congress clearly expressed."  *Id*. at 1664

10   (citation and quotation marks omitted).  *Kiobel*'s extended discussion of the statute makes clear

11   that no such affirmative intention was expressed in the ATCA.  Although *Kiobel* left open the

12   possibility of extraterritorial application of the ATCA, the Supreme Court also provided

13   guidance in defining "touch and concern" by opining that "[c]orporations are often present in

14   many countries, and it would reach too far to say that mere corporate presence suffices."  *Id*. at

15   1669.  Here, it likewise reaches to far to conclude that a defendant's prior, temporary presence in

16   the United States vests this Court with permanent jurisdiction over clearly extraterritorial acts.

17         Plaintiffs application for default judgment on their ATCA claim is **DENIED**.

18         **2.     MERITS AND SUFFICIENCY OF PLAINTIFFS' TVPA CLAIM.**

19         TVPA provides causes of action for victims of torture and extrajudicial killings.  Section

20   2(a) of the TVPA states:

21              An individual who, under actual or apparent authority, or color of
                law, of any foreign nation (1) subjects an individual to torture
22              shall, in a civil action, be liable for damages to that individual; or
                (2) subjects an individual to extrajudicial killing shall, in a civil
23              action, be liable for damages to the individual's legal
                representative, or to any person who may be a claimant in an
24              action for wrongful death.

25   Note following 28 USC 1350, § 2(a).  Taking the well-pleaded facts in the complaint as true, this

26   order finds that plaintiffs have established their TVPA claim by default.

27         Under a plain reading of the statute, plaintiffs do not have standing to bring this suit

28   under Section 2(a)(1) of the TVPA.  The terms of that provision create liability for torture only

4

"to that individual." Instead, plaintiffs' standing lies in Section 2(a)(2) because they are bringing a wrongful death action for their father's extrajudicial killing.

The TVPA defines extrajudicial killing as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id*. at § 3(a). Although our court of appeals does not appear to have spoken on the issue, the clear consensus is that claims under the TVPA "may be based on indirect liability as well as direct liability." *See Bowoto v. Chevron Corp.*, No. 99-2506, 2007 WL 2349341, at *3 n.3 (N.D. Cal. Aug. 14, 2007) (Judge Susan Illston) (collecting cases).

The complaint alleges that Aquino was the deputy director of the Philippine counter-intelligence agency in 2000. He was ordered by Gen. Panfilo Lacson to organize a group of Philippine government agents to abduct, interrogate, and kill Salvador Dacer. The government agents carried out Aquino's instructions. Following the interrogation, they strangled Salvador Dacer with a wire and burned his body in a dry creek (Comp. ¶¶ 41–58). These facts establish that Aquino authorized and directed the extrajudicial killing of Salvador Dacer. These facts further establish that governmental actors carried out the alleged extrajudicial killing under "actual or apparent authority, or color of law."

Section 2(b) of the TVPA states: "A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." When claims are brought under the TVPA, the defendant bears the burden to plead and justify an exhaustion requirement, including the availability of local remedies. Although the plaintiff may rebut this showing with a demonstration of the futility of exhaustion, the ultimate burden remains with the defendant. *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 832 (9th Cir. 2008) (en banc).

A December 2011 order denying Aquino's motion for summary judgment held that the record was "insufficient to show that legal remedies in the Philippines against defendant are effective" (Dkt. No. 43 at 5). The only new, germane fact on this issue is that the criminal proceedings against Aquino in the Philippines following his extradition were dismissed based on

unspecified "technicalities."  This order concludes that the affirmative defense of exhaustion is not established on this record.

\*          \*          \*

Based on the foregoing, this order can reasonably infer that plaintiffs have established the elements of their wrongful death claim under the TVPA.  This order further concludes that none of the *Eitel* factors disturb the foregoing analysis.  Plaintiffs' application for default judgment on the TVPA claim is therefore **GRANTED**.  This order makes no findings on the issue of damages. Plaintiffs will have the opportunity to try to prove their damages at the hearing already scheduled for November 18.

### CONCLUSION.

To the extent stated above, plaintiffs' application for default judgment is **GRANTED IN PART AND DENIED IN PART**.  The November 18 prove-up hearing on damages will proceed as scheduled.

Based on plaintiffs' representation in their pretrial memorandum, defendant Glenn Dumlao is **DISMISSED**.

**IT IS SO ORDERED.**

Dated:   November 7, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California