1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7

8                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   CARINA DACER, SABINA DACER-REYES,          No. C 10-04165 WHA
     AMPARO DACER-HENSON, and EMILY
11   DACER-HUNGERFORD,

12                 Plaintiffs,

13        v.                                     **FINDINGS OF FACT AND
                                                 CONCLUSIONS OF LAW
14   JOSEPH EJERCITO ESTRADA,                    AFTER DEFAULT
     PANFILO M. LACSON, REYNALDO                 PROVE-UP BENCH TRIAL**
15   "BUTCH" TENORIO, DANTE TAN,
     MICHAEL RAY AQUINO, VINCENTE
16   ARNADO, and GLENN DUMLAO, all
     individually and in their official capacity,
17
                   Defendants.
18   _____/

19

20        In this wrongful-death action involving political torture and killings in the Philippines,

21   plaintiffs move for at least $60 million in damages after a default judgment against defendant

22   Michael Aquino was granted on their Torture Victim Protection Act ("TVPA") claim.  This

23   order resolves the damages issue for the TVPA claim following a default judgment prove-up

24   hearing.

25                                    **BACKGROUND**

26        Salvador "Bubby" Dacer was a prominent and influential publicist in the Philippines

27   and a single parent to four daughters — the plaintiffs in this action.  Plaintiffs' mother passed

28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  away when the girls were young.  The Dacer family generally spent many weekends together.

2  The father, Salvador Dacer, encouraged his daughters to play golf and attend family dinners.

3  Salvador Dacer was a generous man who hosted birthday parties for his daughters and holiday

4  events for friends, members of his province, and family.  He was a primary supporter of

5  housing, living, educational, medical, and transportation expenses for his daughters.  A house

6  in Long Beach, California, was purchased for the daughters, but at the time of his death, the

7  daughters were left shouldering portions of the unpaid mortgage payments.

8      Salvador Dacer also provided support to non-family children.  He financially supported

9  sending at least 61 children to school.  These children lost Salvador Dacer's support after his

10  untimely death.

11              **MICHAEL AQUINO'S ROLE IN SALVADOR DACER'S DEATH**

12      Defendant Michael Ray Aquino, a highly ranked Deputy Director of the Philippine

13  National Police – Intelligence Group ("PNP"), the Philippine counterintelligence agency,

14  authorized and directed the extrajudicial killing of Salvador Dacer (Compl. ¶¶ 15, 26, 41–58).

15      The incident began around the time certain officials suspected Salvador Dacer of

16  political dealings (Compl. ¶¶ 30, 34, 43, 53, 70).  Michael Aquino instructed agents to

17  investigate and steal documents from Salvador Dacer (Compl. ¶¶ 30, 43, 53).  After Salvador

18  Dacer lobbied against former defendant Panfilo Lacson's appointment to the Chief PNP post,

19  Michael Aquino was ordered to convene a group of operatives to silence Salvador Dacer

20  (Compl. ¶¶ 40, 41, 48).  Salvador Dacer was in good health at the time.

21      On November 24, 2000, Salvador Dacer was abducted and interrogated based on

22  instructions provided by Michael Aquino (Compl. ¶¶ 54-57, 70, 79).  Salvador Dacer was then

23  strangled with a wire and burned in a dry creek — there, his charred remains were later found

24  (Compl. ¶¶ 57-58, 65).

25      In May 2001, Senator Lacson learned about a pending investigation of Michael Aquino

26  for the murder of Salvador Dacer (Compl. ¶ 68).  Senator Lacson advised Michael Aquino to

27  flee to the United States.  Aquino did.  Michael Aquino subsequently met with an officer

28  involved in the murder and blamed the officer for "sloppily dumping Bubby Dacer's car into a

ravine in Cavite where it was easily discovered" (Compl. ¶¶ 48, 78).  Michael Aquino was later

recommended for an indictment in the Philippines because he was the "coordinator" who

"manage[d] the entire operation via cellular telephone" (Compl. ¶ 71).

In 2005, Michael Aquino was arrested in the United States for illegal possession of

classified documents (Compl. ¶¶ 73, 75).  *United States v. Aquino*, No. 2:05-cr-00719-WHW,

Dkt. No. 16 (D.N.J. Oct. 6, 2005).  He pled guilty and was sentenced to 76 months in prison.

He was subsequently extradited to the Philippines, where he was arrested for the murder of

Salvador Dacer.  The action was dismissed on "technicalities," according to plaintiffs.

## PROCEDURAL HISTORY

Plaintiffs, the four daughters, commenced this action in 2010 against seven individuals

they believed were responsible for the torture and death of their father.  The action was brought

under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. 1350, and the Torture Victim Protection

Act, Pub. L. No. 102–256, 106 Stat. 73 (1993) (codified at 28 U.S.C. Section 1350 note)

("TVPA").  The complaint sought $20 million in compensatory damages and $100 million in

punitive damages (Compl. ¶¶ 91, 96, 99).  Their memorandum on damages, submitted after the

prove-up hearing, seeks at least $10 million in compensatory damages and $50 million in

punitive damages (Dkt. No. 76).

At the time the complaint was filed, defendant Michael Aquino was held in a New

Jersey federal detention center (Compl. ¶ 15).  Plaintiffs experienced difficulties serving most of

the defendants (many of whom were said to be in hiding), received numerous service

extensions, and the non-served defendants were eventually dismissed (Dkt. Nos. 10, 11, 28, 32,

51, 55, 58, 60).

Defendant Michael Aquino, however, was served in June 2011 (Dkt. No. 28).  The same

month, Michael Aquino (proceeding *pro se*) filed a motion to dismiss via mail in an envelope

with a New Jersey federal detention center address (Dkt. No. 12).  Plaintiffs opposed.  The

action was later reassigned to the undersigned judge.

In July 2011, Michael Aquino filed an addendum to the motion to dismiss from "Manila,

Philippines, in the custody of the National Bureau of Investigation of the Philippines" ("NBI

3

United States District Court

For the Northern District of California

1    detention center") (Dkt. No. 20).  The addendum was deemed a re-noticed motion to dismiss

2    and a new briefing schedule was set (with replies due August 15) (Dkt. No 21).  Michael

3    Aquino did not file a timely reply.

4          On August 17, the motion to dismiss was denied without prejudice and Michael Aquino

5    was instructed to file his answer by September 9 (Dkt. No. 25).  On August 23, Michael Aquino

6    filed a late reply in support of his motion to dismiss via mail in an envelope from the same NBI

7    detention center (Dkt. No. 26).  The order reassigning the action and the orders regarding

8    defendant's motion to dismiss were sent (again) to Michael Aquino at the NBI detention center

9    (Dkt. No. 27).

10         In September 2011, Michael Aquino timely filed a 20-page answer (with two exhibits)

11   in an envelope listing the same NBI detention center address.  On October 13,  Michael Aquino

12   filed a motion for summary judgment from the same address.  To account for the time to mail

13   documents to and from the Philippines, an extended briefing schedule was set wherein Michael

14   Aquino's reply brief was due December 1, 2011 (more than one month after the opposition brief

15   was due) (Dkt. No. 35).  He timely filed his reply brief on December 1 (Dkt. No. 42).  This was

16   the last filing by Michael Aquino in this action to date.

17         Upon review of the record (which was woefully lacking because no declarations and

18   only two documents from unrelated proceedings were submitted), the motion for summary

19   judgment was denied (Dkt. No. 43).

20         On February 1, 2013, a trial date was set and Michael Aquino was advised in an order to

21   file a motion if he was in custody and intended to attend the pretrial conference and jury trial.

22   Plaintiffs served the order on February 8, 2013, to the same NBI detention center address

23   Michael Aquino provided plaintiffs and the Court.

24         In September, plaintiffs' filed a pre-trial conference statement — it was not

25   joint — because Michael Aquino "ha[d] not responded to communications from Plaintiffs'

26   counsel."  Michael Aquino, according to plaintiffs was "no longer in the custody of the

27   Philippine government and can attend the federal jury trial of his case" (Dkt. No. 67).

28         Michael Aquino did not appear at the final pretrial conference.  Counsel for plaintiffs

**United States District Court**
For the Northern District of California

1    informed the Court that no current address for Michael Aquino (other than the NBI detention

2    center) had been provided.  Plaintiffs were ordered to serve an additional courtesy copy of their

3    motion for default judgment on Senator Lacson, Michael Aquino's former boss, godfather,

4    mentor, and friend.

5            In October 2013, plaintiffs filed a motion for default judgment against Michael Aquino.

6    No opposition was filed.  A default judgment hearing was held on November 7 and Michael

7    Aquino did not appear.  Default judgment against Michael Aquino was taken for the TVPA

8    claim, but not for the ATCA claim (Dkt. No. 72).  The November 8 default judgment order was,

9    of course, served on the same NBI detention address Michael Aquino provided.

10           The instant order follows a one-day default judgment prove-up hearing held on

11   November 18 for plaintiffs' TVPA default judgment.  Defendant Michael Aquino has also had

12   an opportunity to make an appearance and defend himself from a final order on damages.

13   A December 12, 2013 order stated:  "By noon on January 17 [, 2014], defendant Michael

14   Aquino shall file a statement (not to exceed ten pages) addressing why a final order on damages

15   after a default prove-up trial should not be entered against him based on the trial record.

16   He should further explain whether he intends to seek to reopen the default prove-up trial record

17   to introduce evidence or rebut plaintiffs' evidence.  He should also address why he has failed to

18   appear since 2011" (Dkt. No. 77).  That deadline has now elapsed and Michael Aquino has not

19   responded.

20                              *           *           *

21           Michael Aquino last appeared in this action two years ago.  Notably, he filed an answer,

22   a motion for summary judgment, and a reply.  He has since then failed to appear at no less than

23   eight hearings, including the pretrial conference and the default judgment prove-up hearing.

24   He has failed to provide the Court (or plaintiffs) with an updated address even though he knows

25   about this action for millions of dollars in damages against him.  The Clerk's office, counsel,

26   and the undersigned judge have gone to great lengths to accommodate Michael Aquino's

27   circumstances, but it is now time to enter judgment for damages proven at trial.

28                              *           *           *

Section 2(a) of the TVPA states:

> An individual who, under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Note following 28 U.S.C. 1350, Section 2(a). A prior order has already taken the well-pleaded facts in the complaint as true and found that plaintiffs have established their TVPA claim by default (Dkt. No. 72).

Our court of appeals has not addressed the issue of how to determine damages under the TVPA. Nor does the statute itself. Courts, rather, deal with TVPA damages in a manner similar to common law wrongful death actions. In a frequently-cited decision, the District of Hawaii opined: "Because Congress in the TVPA offered no methodology as to how damages should be determined, federal courts are free to and should create federal common law to provide justice for any injury contemplated by the Alien Tort Statute and the TVPA or treaties dealing with the protection of human rights." *In re Estate of Marcos Human Rights Litigation*, 910 F. Supp. 1460, 1469 (D. Haw. 1995) (Judge Manuel Real). It is also notable that "[u]nder the TVPA, courts have awarded significant compensatory and punitive damages for extrajudicial killing." *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2007 WL 2349341, at *8 (N.D. Cal. Aug. 14, 2007) (Judge Susan Illston), citing *Doe v. Saravia*, 348 F. Supp. 2d 1112, 1158 (E.D. Cal. 2004) (collecting cases awarding $500,000 to $10 million in compensatory damages and $1 million to $25 million in punitive damages).

Drawing on the *In re Estate of Marcos* and *Saravia* decisions, the following non-exhaustive list of factors may be considered: (1) brutality of the act and egregiousness of defendant's conduct; (2) physical suffering, mental abuse, and injuries; (3) amount of time torture lasted and length of detention, if any; (4) victim's age; (5) loss of comfort, society and support, and mental anguish; (6) actual losses, including medical bills; (7) lost earnings; (8) deterrence; (9) punitive damages; and (10) provision of redress to plaintiff, country and the world.

6

**United States District Court**
For the Northern District of California

**BRUTALITY, TORTURE, PHYSICAL AND MENTAL SUFFERING, AND INJURIES.**

1.    In November 2000, Salvador Dacer was summoned to the Presidential residence and accused of working to have then-President Estrada impeached.  Salvador Dacer was berated and left the President's home in fear of his life.

2.    A few days later, Salvador Dacer was abducted, interrogated, strangled with a wire, and burned in a dry creek.  He was blindfolded, hogtied, and gagged.  His bone fragments and dentures were found, eventually.  He was sixty-six years old.

**EGREGIOUSNESS OF DEFENDANT'S CONDUCT AND DETERRENCE.**

3.    Defendant Michael Aquino played a significant role in authorizing, instructing, and coordinating the effort to kill Salvador Dacer.  At 11 a.m. on December 24, Michael Aquino sent a text message stating that Dacer had been taken.  He also issued instructions to interrogate and "neutralize" the decedent.  The Philippine Department of Justice, when they recommended the indictment of Michael Aquino, noted that he was "obviously stage managing the entire operation via cellular telephone."

4.    Michael Aquino's brutal actions took the life of a prominent and influential publicist, a friend and mentor to the Filipino community, and a father to four now-orphaned daughters.  The cruel manner in which defendant orchestrated the abduction, torture, and killing of Salvador Dacer is chilling.

5.    These actions should not go unnoticed.  Indeed, to some extent, they have not.  Defendant was indicted by the Philippine government for the "double murder" of Salvador Dacer and his driver, Emmanuel Corbito.  The action, however, was dismissed on "technicalities," according to plaintiffs.  Michael Aquino, according to the plaintiffs, is no longer in the custody of the Philippine government.  His whereabouts are unknown.

6.    It is important to deter extrajudicial killings of publicists, especially when the victims include four United States citizens.  Despite "silencing" Salvador Dacer in such a gruesome manner, Michael Aquino has apparently escaped relatively unscathed.  It may be possible, given his past attempt to flee to the United States after the murder, that he could enter the United States again.  Therefore, plaintiffs will be awarded the relief granted herein.

7

United States District Court

For the Northern District of California

EXPENSES, LOSSES, AND REDRESS.

7.      Plaintiff Carina Dacer appeared at trial to testify regarding the expenses incurred and losses suffered subsequent to her father's untimely death.  Her father, Salvador Dacer, was in good health at the time of his death and likely would have been able to continue providing support to his four daughters.  The support he provided to his daughters (who lost their mother at a young age) included housing, education, medical, living, and gifts.  Carina Dacer provided the following compilation of damages (TX 1):

| | Emily | Sabina | Carina | Ampy | Annual Expense |
|---|---|---|---|---|---|
| Housing | $14,400 | $42,000 | $36,000 | $14,400 | $106,800 |
| Car / Transportation | $20,000 | $30,000 | $16,000 | $16,000 | |
| Grocery | N/A | N/A | $6,000 | $6,000 | $12,000 |
| Utilities | $3,600 | $12,000 | $2,400 | $3,600 | $21,600 |
| Miscellaneous | $8,000 | $8,000 | $8,000 | $8,000 | $32,000 |
| Medical | $1,000 | $5,000 | $5,000 | $1,000 | $12,000 |
| Education | $34,000 | $24,000 | $20,000 | $34,000 | |
| | | | | | |
| The lost of gifts of benefits | | | | | |
| Birthday | $750 | $750 | $750 | $750 | $3,000 |
| Christmas | $750 | $750 | $750 | $750 | $3,000 |
| Gifts to Grandchildren | N/A | $2,000 | N/A | N/A | $2,000 |

| | Other Expenses | Years Dead | Expected Life Expectancy | Total Amounts |
|---|---|---|---|---|
| Annual Expense | $192,400 | 13 | 13 | $5,002,400 |
| Loss of Income - Siblings in Manila | $24,000 | | | $24,000 |
| Fixed Expense | $194,000 | | | $194,000 |
| Other siblings (half) - education and allowance | $50,000 | | | |
| Funeral / Burial | $10,000 | | | |
| Legal Expense in the Philippines | $300,000 | | | |
| Monthly remittance to the Philippines | $14,400 | 13 | | $187,200 |
| | | | | |
| Total - Economic | | | | $5,407,600 |
| Non-Economic | | | | |

**Figure.  Plaintiff's Compilation of Damages.**

The figure shows five columns:  Emily, Sabina, Carina, and Ampy (Amparo), the four plaintiffs in this action.  The $36,000 sum under housing for Carina, for example, consists of Carina's expenses for the mortgage of the house in Long Beach.  The $750 sum under birthday for Emily represents the expenses incurred for celebrating Emily's birthday — dinners, parties, and gifts.  Christmas was a grand celebration for the Dacer family.  Salvador Dacer would invite approximately 200 people from his province and host an annual gathering.

8.      After their father's death, the four daughters experienced significant hardships. *First*, they were traumatized by the gruesome method in which their father was killed.  *Second*, due to Salvador Dacer's prominence in his community, the media and the government hounded

8

United States District Court

For the Northern District of California

the plaintiffs and they feared for their lives. *Third*, plaintiffs moved unwillingly after their father's death. Emily had been living in the United States at the time, but had to move to the house in Long Beach to support the mortgage payments. Sabina and Amparo left their homes in the Phillippines because politicians, government officials, and the press would gather outside their homes, telephone them, and pressure them into attending events. Sabina's daughter — the decedent's granddaughter — was two years old at the time. Plaintiff Sabina relocated her family to the United States as a consequence. *Fourth*, plaintiffs spent approximately $10,000 on their father's memorial service. The precise documentation related to the Manila memorial service, however, was destroyed in a storm that flooded their home some years ago. A second memorial service was held by Carina and others in Los Angeles. *Fifth*, plaintiffs were forced to start a new life in the United States without their father. Carina, for example, originally planned to start her own business in the Philippines using her father's network. This was never realized because Carina stayed in the United States for her safety and privacy. Similarly, all four daughters lost financial support, love, protection, assistance, and companionship from their dad after his death. Plaintiffs also itemize the following non-economic losses:

- network and financial support for business ventures
- leaving everything behind — friends, family, work and everything that was familiar; lifestyle
- re-arrange career; loss of job
- effect on niece who had to move multiple times and watch her parents fight all the time
- moved to house farther from work to make mortgage payments
- cheated out of insurance
- relocation to the U.S. of three siblings
- distress caused by constant media and political pressure
- fear of safety in the Philippines at the time of the murder
- fear from the powerful politicians behind the crime
- uncertainly of future in the U.S. — retraining, jumping from one location to the next

(TX 1).

9

9.     While this order takes into account Carina Dacer's testimony (TX 1) and the

devastating circumstances surrounding Salvador Dacer's death, the damages number requested

— $60 million — is excessive.  Carina Dacer, for example, "estimates" that her father provided

enough to supply his daughters with approximately $192,400 per a year to live in the Philippines

and the United States ($5,002,400 for 13 years).  There is insufficient evidence to find that

Salvador Dacer made enough income to provide such a sum to his daughters or that such a large

sum was indeed provided.  Carina Dacer also testified that her father paid approximately two

thousand dollars per a month for the loan payments on the Long Beach house when he was alive.

Her estimate, which is not based on supporting documentation, fails to account for the

accumulating investment value of the house.  Furthermore, none of Carina Dacer's estimates in

TX 1 appear to adjust for present value or interest.  This order weighs the entirety of the

evidence and awards damages to plaintiffs, all to be adjudged against Michael Aquino, as

follows:

| | | | |
|---|---|---|---|
| Housing: | $ 25,000 * 13 years | = | $   325,000 |
| Living Expenses: | $   8,000 * 13 years | = | $   104,000 |
| Holidays and Birthdays: | $   4,000 * 13 years | = | $     52,000 |
| Transportation: | | | $     82,000 |
| Medical: | | | $   156,000 |
| Education: | | | $   112,000 |
| Funeral: | | | $     10,000 |
| Compensatory Damages: | | | $   841,000 |
| Punitive Damages: | $841,000 * 4 | = | $ 3,364,000 |
| **Total:** | | | **$ 4,205,000** |

1  Judgment for plaintiffs in the amount $4,205,000 will be entered.  Each individual

2 plaintiff (i.e. Carina Dacer, Sabina Dacer-Reyes, Amparo Dacer-Henson, and Emily Dacer-

3 Hungerford) shall receive $1,051,250.

4  It is hereby **ORDERED** that the clerk will send this order to U.S. Immigration and

5 Customs Enforcement with the recommendation that Michael Ray Aquino not be allowed to

6 enter the borders of the United States, unless (in addition to other conditions that may be

7 imposed) he pays in full this judgment.

8

9  **IT IS SO ORDERED.**

10

11 Dated:   January 21, 2014.

12         WILLIAM ALSUP
          UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California